# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

**LUE BERTHA WHITE as Personal** )
**Representative of the Estate of Larry** )
**Wade White, deceased,** )
                             )
      **Plaintiff,** )
                             )
**vs.** )      **Civil Action No. 5:19-CV-00916-CLS**
                             )
**FORD MOTOR COMPANY,** )
                             )
      **Defendant.** )

## MEMORANDUM OPINION

Larry Wade White was driving home from work around 2:00 o'clock in the early morning hours of Friday, April 13, 2018.[1]  A co-worker, Tammy Walker, was riding in the passenger seat of his 2003 Ford Taurus.  They were in Limestone County, traveling east on Alabama Highway 20 toward its intersection with U.S. Interstate 65 near Mooresville, Alabama.  Their automobile was moving at a speed of approximately 61 miles an hour.[2]

At the same time and place, an intoxicated Kaitlynn Rae Hall was driving her Jeep Cherokee directly behind Mr. White in the same left, inside lane of the four-lane

---

[1] The possible origins of the superstition that Fridays falling on the 13th day of any month in the Gregorian calendar are unlucky are discussed at Friday the 13th, Wikipedia, https://en.wikipedia.org/wiki/Friday_the_13th.

[2] *See* doc. no. 35 (Defendant's Exhibit A - Alabama Uniform Traffic Crash Report), at 5; *see also id.* at 13 (Defendant's Exhibit B - Expert Report of Michael McCort).

highway, but she was moving at the excessive speed of 91 miles an hour.[3] When she belatedly comprehended that she was fast approaching the rear of Mr. White's vehicle, she veered sharply to the right but, nevertheless, still clipped the right rear of his automobile.[4] The force of that collision almost instantly accelerated the speed of Mr. White's Ford Taurus to approximately 78 miles an hour, and caused the vehicle to rotate in a counterclockwise direction,[5] during which Mr. White lost control. As his Taurus spun into the median separating the east- and west-bound lanes of Alabama Highway 20,[6] the front of the vehicle struck a metal drainage grate, "tripping" his auto, and catapulting it into the air.[7] The Taurus completed a half roll before slamming back down upon its roof, principally on the driver's side, and sliding some 181 feet across the pavement before coming to a rest.[8] Mr. White was partially

---

[3] *See* doc. no. 38 (Defendant's Exhibit F - Expert Report of Don Tandy), at 52, ¶ 2; *see also* doc. no. 43 (Defendant's Exhibit L - Indictment of Kaitlynn Rae Hall), at 3 (indicting Ms. Hall on one count of reckless murder [Ala. Code § 13A-6-2(a)(2)], one count of felony leaving the scene of an accident [Ala. Code § 32-10-2], and one count of driving under the influence [Ala. Code § 32-5A-191(a)(2)]). Ms. Hall is still awaiting trial on those charges.

[4] *See* doc. no. 38 (Defendant's Exhibit F - Report of Don Tandy), at 52, ¶¶ 2-3 ("Just prior to impact, Ms. Hall steered hard to the right. Ms. Hall crashed the left front portion of her Cherokee into the right rear corner of the Taurus.").

[5] The parties refer to this maneuver as a "yaw": a verb that the Oxford English Dictionary defines as a twist, rotation, or oscillation of a moving ship or aircraft around a vertical axis. *See also*, *e.g.*, Yaw (rotation), Wikipedia, https://en.wikipedia.org/wiki/Yaw_(rotation) (defining a "yaw rotation" as "a movement around the yaw axis of a rigid body that changes the direction it is pointing, to the left or right of its direction of motion").

[6] *See* doc. no. 35 (Defendant's Exhibit B - Expert Report of Michael McCort), at 13.

[7] *Id.*; *see also* doc. no. 38 (Defendant's Exhibit F - Expert Report of Don Tandy), at 52, ¶ 5.

[8] *See* doc. no. 35 (Defendant's Exhibit B - Expert Report of Michael McCort), at 13.

ejected through the broken glass of the driver's side-window and suffered fatal injuries.[9]

Mr. White's mother, Lue Bertha White, subsequently filed suit against Ford Motor Company. Her complaint asserts claims for: violation of the so-called "Alabama Extended Manufacturers Liability Doctrine" (Count I); negligent and wanton design of the Taurus' roof (Counts II and III);[10] and, a claim based upon Alabama's wrongful death statute (Count IV).[11]

---

[9] *Id.* The parties use the phrase "partially ejected" when attempting to account for the movements of Mr. White's body after the roof of the Ford Taurus slammed back down upon the road surface and slid across the pavement, but this court suggests that it may be more appropriate to say that his head was "exposed" to the road surface through the broken glass of the driver's side-window.

[10] Plaintiff withdrew her contention that the back of Mr. White's driver's seat was defective. She also withdrew her failure to warn claim. *See* doc. no. 54 (Plaintiff's Opposition to Defendant's Motion for Summary Judgment), at 3.

[11] Section 6-5-410 of Alabama's 1975 Code provides that the personal representative of a deceased person

> may commence an action and recover such damages as the jury may assess in a court of competent jurisdiction within the State of Alabama where provided for in subsection (e), and not elsewhere, for the wrongful act, omission, or negligence of any person, persons, or corporation, his or her or their servants or agents, whereby the death of his testator or intestate was caused, provided the testator or intestate could have commenced an action for such wrongful act, omission, or negligence if it had not caused death.

> (b) The action shall not abate by the death of the defendant, but may be revived against his or her personal representative and may be maintained though there has not been prosecution, conviction, or acquittal of the defendant for the wrongful act, omission, or negligence.

> (c) The damages recovered are not subject to the payment of the debts or liabilities of the testator or intestate, but must be distributed according to the statute of distributions.

This opinion addresses six motions filed by Ford Motor Company: *i.e.*, (1) a motion for summary judgment (doc. no. 27); (2) a motion to exclude the opinions of expert witness Steven Meyer (doc. no. 29); (3) a motion to exclude the opinions of expert witness Brian Herbst (doc. no. 31); (4) a motion to exclude the opinions of expert witness Paul Lewis, Jr. (doc. no. 33); (5) a motion to strike, in part, the supplemental affidavit of expert witness Paul Lewis, Jr. (doc. no. 74); and (6) a motion to strike the affidavit of Mr. White's passenger, Tammy Walker (doc. no. 75). The evidentiary motions will be addressed first.

## I. STANDARDS FOR ADMISSION OF THE OPINIONS OF EXPERT WITNESSES

Analysis of the admissibility of testimony by so-called "expert witnesses" must begin with Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and

---

(d) The action must be commenced within two years from and after the death of the testator or intestate.

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. That language "compels the district courts to perform the critical 'gatekeeping' function concerning the admissibility of expert scientific [and technical] evidence.'" *United States v. Abreu*, 406 F.3d 1304, 1306 (11th Cir. 2005) (quoting *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004)) (alteration in original). "This function inherently require[s] the trial court to conduct an exacting analysis of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *Id.* (alteration in original, internal quotation and citation omitted).

> The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The analysis requires

> the proponent of the testimony [to] show that: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which he reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001) (alteration supplied, citations omitted). "The inquiry . . . is . . . a flexible one" because, in any given case, "[m]any

factors will bear on the inquiry, and . . . [there is no] definitive checklist or test." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-94 (1993) (alterations and ellipses supplied).

## II. DEFENDANT'S EVIDENTIARY MOTIONS

### A. Motion to Exclude the Testimony of Steven Meyer (doc. no. 29)

Plaintiff originally alleged that the back of the driver's seat in the 2003 Ford Taurus was, like its roof structure, defectively designed, but withdrew that contention in response to defendant's motion for summary judgment.[12] As a result, she no longer has a need for the opinion testimony of Steven Meyer, and has withdrawn him as a potential trial witness.[13] Consequently, the referenced motion will be denied as moot.

### B. Motion to Exclude the Testimony of Brian Herbst (doc. no. 31)

Plaintiff retained Professional Mechanical Engineer Brian Herbst to determine the structural strength of the roof of the 2003 Ford Taurus driven by Mr. White on the date of his death. To do so, Mr. Herbst inspected both that vehicle, and, an undamaged prototype of the same model. He found that the roof structures of both vehicles consisted of a variety of sheet metal components, which included four pillars (designated "A-," "B-," "C-," and "D-pillars"), two headers ("Front-" and "Side-

---

[12] *See* doc. no. 54 (Plaintiff's Opposition to Motion for Summary Judgment), at 3.

[13] *See* doc. no. 55 (Plaintiff's Opposition to Motion to Exclude Steven Meyer), at 1.

Headers"), and front and rear "junctions" of those components.[14]  Mr. Herbst's

inspection of the vehicle in which Mr. White died demonstrated that the frame of the

roof above the driver's side-window failed at the A-pillar, B-pillar, and Side-

Header.[15]  He believes that those failures caused the roof on the driver's side of the

vehicle to collapse "into the occupant compartment, compromising the occupant's

*survival space* significantly."[16]

> The *survival space concept* is simple:  maintain the space around an occupant by minimizing intrusion of the surroundings which will reduce likelihood of occupant injury.  The *survival space concept* applies to all impact modes, including frontal, side, rear and rollover. With the amount of roof crush that occurred in the accident [at issue in this case], the subject vehicle failed to maintain an acceptable survival space (primarily the space between the occupant's head and the roof).

Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), at 14 (emphasis

and bracketed text supplied).

Mr. Herbst evaluated the A-pillar, B-pillar, and Side-Header structures of the

2003 Ford Taurus against the federal standard for measuring "roof crush resistance"

of such vehicles on the date that Mr. White's vehicle was manufactured:  *i.e.*, Federal

Motor Vehicle Safety Standard 216, adopted by the National Highway Traffic Safety

---

[14] *See* doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 7.1 and Figure 7, at 14.

[15] *Id*. ¶ 7.2, at 15-21.

[16] *Id*. ¶ 7.2, at 15 (emphasis supplied).

Administration.[17] That standard required vehicles having a Gross Vehicle Weight Rating of less than 6,000 pounds (as did the 2003 Ford Taurus) to "generate a roof resistance strength of 1½ times the vehicle weight when loaded by an angled steel plate (platen) pushed against the A-pillar top within 5 inches of platen travel . . . ."[18] Mr. Herbst noted that Ford certified that the 2003 Ford Taurus complied with the Federal Motor Vehicle Safety Standard 216 at a roof resistance strength of 1.77 times the vehicle's weight.[19] Even so, he is of the opinion that roof resistance strengths of only 1.5 times *and* 1.77 times the vehicle's weight were, *both*, "far too low to provide adequate roof crush resistance in real world rollovers."[20] In that regard, he noted that the currently-applicable Federal Motor Vehicle Safety Standard 216 requires a roof resistance strength rating that is *three* times the vehicle's weight for vehicles having a Gross Vehicle Weight Rating of less than 6,000 pounds. *See* 49 C.F.R. § 571.216a, ¶ S5.2(a).[21]

---

[17] *Id.* ¶ 8, at 22.

[18] *Id*. ¶ 8.1.2, at 22 (ellipsis supplied).

[19] *See id.* ¶ 8.3, at 26.

[20] Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 8.1.4, at 24-25 (the textual quotation references only a roof resistance strength of 1.5 times the vehicle's weight); *see also id.* ¶ 11.1, at 40 (opining that the Taurus's 1.77 roof strength was "grossly inadequate").

[21] Paragraph S5.2(a) of 49 C.F.R. § 571.216a provides that:

The maximum applied force the vehicle's roof in Newtons is: (a) For vehicles with a [Gross Vehicle Weight Rating] of 2,722 kilograms (6,000 pounds) or less, any value up to and including 3.0 times the unloaded vehicle weight of the vehicle, measured in kilograms and multiplied by 9.8. [Bracketed definition supplied.]

8

Mr. Herbst performed inverted drop tests of *two* vehicles: the first, a prototype (production test) 2003 Ford Taurus *identical* to the one driven by Mr. White on the date of the subject incident; and the second, a prototype (production test) vehicle that he modified for the purpose of creating a stronger roof structure. He did so in order to examine the comparative roof strengths of the two vehicles, and to determine whether there was a factual basis for his opinion that Ford could have manufactured a stronger roof at a production cost that would not greatly affect the retail profitability of the strengthened vehicle. First, he dropped a prototype (production test) 2003 Ford Taurus on the driver's side from a height of 18 inches, a roll angle of 20 degrees, and a pitch angle of 5 degrees, resulting in a contact velocity of 6.7 miles per hour (mph) — "a speed comparable to a parking lot vehicle collision,"[22] and a velocity that mimicked that of Mr. White's Taurus when its roof crashed down upon the pavement following its half-rollover.[23] The roof of the production test vehicle crushed "in a very predictable way at the A-pillars and B-pillars," and "penetrated well into the occupant survival space."[24]

A second prototype (production test) vehicle then was created with a stronger

---

[22] Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 10.1, at 31.

[23] The downward velocity during the crash was only 5 miles per hour. *See* doc. no. 35 (Defendant's Exhibit B - Expert Report of Michael McCort), at 21 ("[T]he vertical component of velocity when the roof made contact with the ground was approximately 5 MPH.").

[24] Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 10.1 and Table 5, at 31.

roof, reinforced with the following internal steel and structural void filling modifications.

> Specifically, OEM Ford Taurus sheet metal was obtained from a donor vehicle and used to double [the] sheet metal layers along the headers and pillars. Additional reinforcements were added using 4130 steel. With the steel reinforcements in place, expanding rigid foam was added. The expanding rigid structural void filling foam was used to fill the voids inside the pillars, headers, and the roof bow. When completed, the modifications made to the alternative design Ford Taurus were hidden inside the vehicle's OEM components and did not alter the vehicle's appearance.

> The methodology employed in the alternate design inverted drop test was identical to that used for the production inverted drop test conducted by SAFE.[25] The alternate design inverted drop test vehicle experienced the exact same impact conditions as the production vehicle did. Therefore, the alternate design test results are directly comparable to the production inverted drop test results.

Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 10.5, at 36 (alteration and footnote supplied).

The reinforced roof crushed about 90% less than the first prototype (production test) vehicle.[26] Mr. Herbst estimated that the cost to double the roof strength on the 2003 Ford Taurus would have been an average of $20 per vehicle.[27] He concluded his expert report with the following opinions:

---

[25] "SAFE" is an abbreviation referencing the full name of Mr. Herbst's engineering firm: *i.e.*, SAFE Laboratories, LLC. *See id.* ¶ 2, at 4

[26] *See id.* ¶ 10.5, Table 6, at 36.

[27] *See id.* ¶ 10.7, at 39.

1. The design of the subject 2003 Ford Taurus is defective and unreasonably dangerous due to an inadequate occupant protection system for rollovers. Specifically, it employs a structurally inadequate roof design that allows excessive intrusion in a very foreseeable and low severity rollover environment.

2. At the time of the design and manufacture of the 2003 Ford Taurus, alternate roof designs were readily and inexpensively available that would have resulted in a non-defective roof with minimal roof crush susceptibility.

3. Ford failed to dynamically test the 2003 Ford Taurus roof and occupant safety systems appropriately, specifically in the rollover mode.

Doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 12, at 44 (paragraph numbers supplied).

Ford challenges the reliability of Mr. Herbst's opinions, principally upon the basis of two arguments: his inverted drop testing did not replicate the exact forces of the crash at issue; and, without the use of test dummies, he did not (and cannot) determine whether Mr. White's head injuries could have been prevented.[28] Ford contends that, because Mr. Herbst's tests did not incorporate the use of dummies and, therefore, could not address the all important issue of whether Mr. White's head injuries could have been prevented, his proffered testimony does not meet the "most significant *Daubert* factor"[29] — that is, whether his opinion "can be (and has been)

---

[28] *See* doc. no. 32 (Brief in Support of Motion to Exclude Brian Herbst), at 10-12.

[29] *Cummins v. Lyle Industries*, 93 F.3d 362, 368 (7th Cir. 1996).

tested."[30]  Ford also agrees that it could have built a stronger roof in 2003: an admission that, it contends, renders most of Mr. Herbst's testimony immaterial.[31]

Plaintiff initially responds that, under Alabama product liability law, she is "required to prove that the subject Ford Taurus' roof is defectively designed and that there existed feasible, safer practical alternatives, *i.e.* stronger roofs, at the time the subject Ford was manufactured."[32]  Accordingly, plaintiff contends that, unless Ford will stipulate that its roof was defective, and, that safer, practical alternative designs were readily available, then she is required to present Mr. Herbst's testimony to prove the elements of her product liability claim.[33]

Plaintiff also responds that inverted drop testing is a reliable method commonly used in the automotive industry.[34]  She notes that Mr. Herbst cites numerous, peer-reviewed publications that establish inverted drop testing as a reliable and generally-accepted methodology, and that such tests support Herbst's opinions that the roof was structurally inadequate and could have been improved.[35]

Plaintiff additionally contends that Ford is trying to confuse the issues by

---

[30] *Daubert*, 509 U.S. at 593.

[31] *See* doc. no. 32 (Brief in Support of Motion to Exclude Brian Herbst), at 10.

[32] Doc. no. 56 (Plaintiff's Opposition to Motion to Exclude Brian Herbst), at 2.

[33] *See id.* at 2-3.

[34] *See id.* at 6-17.

[35] *Id.*

arguing that crash test dummies were necessary. Plaintiff emphasizes that Mr. Herbst is the design expert, not the biomechanics expert.[36] Paul Lewis, Jr., is the expert witness hired to offer an opinion on the issue of whether Mr. White's head injuries could have been prevented by a stronger roof, whereas Mr. Herbst was retained to demonstrate the manner in which the roof collapsed, and, to determine whether the roof around Mr. White could have been made stronger. Plaintiff adds that the use of test dummies can provide misleading data, because their necks are overly rigid.[37]

Following review of the pleadings, briefs, and arguments of counsel, this court concludes that inverted drop testing is a commonly- and generally-accepted method of testing roof strength, and testimony based on inverted drop tests has consistently been admitted by courts within and without the Eleventh Circuit. Such testimony often was admitted precisely *because* it did not purport to re-create the events of the collision at issue, but simply to demonstrate the contact forces at play during the accident. *See, e.g.*, *Crossley v. General Motors Corp.*, 33 F.3d 818, 822 (7th Cir. 1994) ("Demonstrations of experiments used merely to illustrate the principals forming an expert opinion do not require strict adherence to the facts, and courts may admit such demonstrations so long as they are offered to illustrate scientific principals

---

[36] *Id.* at 12.

[37] *Id.* at 15.

rather than as re-enactments.") (internal citations and quotation marks omitted); *Fox v. General Motors LLC*, No. 1:17-cv-209-MHC, 2019 WL 3483171, at *6-8 (N.D. Ga. Feb. 4, 2019) (allowing Brian Herbst [the same expert witness at issue] to testify using inverted drop tests); *Ruark v. BMW of North America, LLC*, No. ELH-09-2738, 2014 WL 351640, at *9 (D. Md. Jan. 30, 2014) (holding that "inverted drop tests are a scientifically valid method for analyzing roof performance in rollover crashes, even though they do not replicate the precise circumstances of a rollover crash"); *Milne v. Volkswagen AG*, No. 2:05-cv-323, 2009 WL 10702722, at *1 (D. Vt. Jan. 22, 2009); *Whitten v. Michelin Americas Research & Development Corp.*, No. 05-2761-JPM/TMP, 2008 WL 2943391, at *5-7 (W.D. Tenn. July 25, 2008) (allowing inverted drop testing evidence because it did not purport to recreate the accident) (citing *Muth v. Ford Motor Co.*, 461 F.3d 557, 566 (5th Cir. 2006) ("When the demonstrative evidence is offered only as an illustration of general scientific principles, not as a reenactment of disputed events, it need not pass the substantial similarity test."); *Cabassa-Rivera v. Mitsubishi Motors Corp.*, No. 05-1217(JAF), 2006 WL 6870560, at *4-6 (D. P.R. May 2, 2006). Additionally, the court finds that the decision not to employ crash test dummies during the inverted drop test was reasonable and does not make the test unreliable. *See, e.g.*, *Ruark*, 2014 WL 351640, at *8.

Following review of Mr. Herbst's written report, deposition testimony, and

statements on direct- and cross-examination before this court on Wednesday, June 23, 2021, the court finds that he is a qualified expert who employed reliable methods to form an opinion that will be useful to the jury. Accordingly, defendant's motion to exclude his testimony and opinions is due to be denied.

**C.    Motion to Exclude the Testimony of Paul Lewis, Jr. (doc. no. 33)**

Plaintiff also retained Biomedical Engineer Paul Lewis, Jr., to provide an expert opinion on the cause of Mr. White's fatal injuries, and the "forces and motions necessary to cause the injury."[38] Mr. Lewis inspected the subject vehicle, reviewed additional evidence in the case, and studied peer-reviewed literature in order to reach the following conclusions:

1.    The available evidence supports that Mr. White was utilizing his seatbelt at the time of the incident.

\* \* \* \*

2.    Mr. White's fatal head injuries were the result of a chain of events:    1) his seatback experiencing excessive rearward deflection in the rear end impact portion of the accident sequence, and 2) the Ford rolling onto the roof, crushing his driver's side roof structures down and inward in reference to Mr. White's body causing him to be partially ejected through the driver's door window opening.

\* \* \* \*

3.    Mr. White's crushing and avulsive head injuries would have been

---

[38] Doc. no. 60 (Plaintiff's Exhibit D - Expert Report of Paul Lewis, Jr.), ¶ I, at 20.

prevented had the driver's seatback remained more upright in the rear-end impact portion of the accident sequence and the driver's roof structures downward and inward deformation been mitigated via a means determined by the roof expert in this case. This also would have resulted in mitigating any other injuries.

Doc. no. 60 (Plaintiff's Exhibit D - Expert Report of Paul Lewis, Jr.), ¶¶ VII.1, VII.2, and VII.3 at 27, 29, and 37, respectively.[39]

With regard to Mr. Lewis's first opinion, Ford argues that he cannot offer reliable testimony on Mr. White's seatbelt usage because he does not reach an ultimate conclusion, and his "insinuation" that the evidence is consistent with seatbelt usage is "inadmissibly unreliable."[40]

Plaintiff responds that Mr. Lewis's testimony is reliable and consistent with the police accident report and the testimony of the passenger in Mr. White's car, Tammy Walker.[41] Further, Mr. Lewis appropriately confines his testimony to only what he can state with certainty: the evidence is consistent with seatbelt use, but is not conclusive. Specifically, Mr. Lewis opined that "heavy load marks" — the most obvious indication of seatbelt use — would not be expected because Mr. White's

---

[39] Plaintiff has withdrawn her claim regarding the seatback, but Mr. Lewis's opinions combine references to both the alleged seatback and roof defects.

[40] Doc. no. 34 (Brief in Support of Motion to Exclude Paul Lewis, Jr.), at 4-5.

[41] *See* doc. no. 57 (Plaintiff's Opposition to Motion to Exclude Paul Lewis, Jr.), at 18. However, Ms. Walker's affidavit stating Mr. White was wearing a seatbelt will not be considered on summary judgment. *See infra* Section II.E.

body was moving away from the belt during the crash sequence.[42]  He also noted some "light abrasion on the latch plate that could be consistent with" seatbelt use, and "some blood around the 18-inch mark on the non-occupant surface of the lap belt webbing" that could also be indicative of seatbelt usage.[43]  Plaintiff contrasts Mr. Lewis's opinion with that of Ford's expert, who will unequivocally state that Mr. White was *not* wearing his seatbelt.[44]  As the court stated during the June 23 hearing, it finds Mr. Lewis's testimony about Mr. White's seatbelt reliable and admissible.

Ford also argues that Mr. Lewis's testimony is unreliable because it is untested and conclusory.[45]  Plaintiff responds that Ford ignores the detailed analysis contained in Mr. Lewis's report, and the measurements and calculations he made regarding the seated height of Mr. White and the relative roof crush.[46]  Mr. Lewis explained in his report that the passenger in Mr. White's vehicle, Tammy Walker, was uninjured because the roof did not crush on the right side where she was seated.  Mr. Lewis also cited several studies that show the importance of occupant survival space to surviving a rollover crash, and ultimately opined that, if Mr. White's survival space had been

---

[42] *See* doc. no. 60 (Plaintiff's Exhibit D - Expert Report of Paul Lewis, Jr.), ¶ VII.1.1, at 27-28.

[43] Doc. no. 42 (Defendant's Exhibit J - Paul Lewis, Jr. Deposition), at 39.

[44] *See* doc. no. 57 (Plaintiff's Opposition to Motion to Exclude Paul Lewis, Jr.), at 2.

[45] *See* doc. no. 34 (Brief in Support of Motion to Exclude Paul Lewis, Jr.), at 6-9.

[46] *See* doc. no. 57 (Plaintiff's Opposition to Motion to Exclude Paul Lewis, Jr.), at 9.

preserved, his fatal head injuries would have been prevented.[47]

Experts are allowed to rely on their knowledge, experience, and review of peer-reviewed studies to form an opinion. Using that methodology, Mr. Lewis's testimony has never been excluded by any court. In fact, in another case in which Ford was the defendant, Ford moved to exclude Paul Lewis's testimony for the same reasons it advances here: *i.e.*, Mr. Lewis did not perform any tests, and relied solely on studies in forming his opinion. That court denied Ford's motion stating, "an expert may rely on other experts' studies when formulating his opinion." *Michery v. Ford Motor Co.*, No. CV 12-4957-RSWL-FFMx, 2017 WL 10362135, at *7 (C.D. Cal. Oct. 23, 2017) (citing *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices & Products Liability Litigation*, 978 F. Supp. 2d 1053, 1070-72 (C.D. Cal. 2013) (denying Toyota's motion to exclude and finding that the expert's reliance on other reports by other experts and studies by NHTSA and others was sufficient)). The court went on to add that, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination. It is properly left to the jury to determine to what extent the studies support the experts' opinions." *Id.* (internal citations omitted, alteration supplied).

---

[47] *See* doc. no. 60 (Plaintiff's Exhibit E - Expert Report of Paul Lewis, Jr.), ¶¶ VII.3, at 37-41.

Following review of Mr. Lewis's written report, deposition testimony, and statements on direct- and cross-examination before this court on Wednesday, June 23, 2021, the court finds that he is a qualified expert who employed reliable methods to form an opinion that will be useful to the jury. It will be up to the jury to determine the extent to which the studies upon which Mr. Lewis relied support his ultimate conclusions. Accordingly, defendant's motion to exclude the testimony and opinions of Paul Lewis, Jr., is due to be denied.

## D.    Motion to Strike, in Part, the Affidavit of Paul Lewis, Jr. (doc. no. 74)

Mr. Lewis also drafted an affidavit in support of plaintiff's response to defendant's motion for summary judgment.[48] Ford moves to strike, in part, that affidavit because it includes a new, undisclosed opinion.[49] Specifically, Ford argues that paragraphs 41 through 44 of Lewis's affidavit lay out a "new" opinion that, if the glass had not broken in Mr. White's driver's side-window, he would not have been partially ejected from the vehicle.[50] Ford moves to strike those paragraphs under the so-called "sham affidavit" rule, which allows courts to "disregard an affidavit if it flatly contradicts, without any explanation, clear testimony that is provided at an

---

[48] Doc. nos. 62 & 63 (Plaintiff's Exhibit F - Lewis Affidavit).

[49] *See* doc. no. 74 (Motion to Strike Lewis Affidavit), at 2.

[50] That opinion is significant because the glass did not break in the reinforced production vehicle when dropped in Mr. Herbst's inverted drop test. *See* doc. no. 61 (Plaintiff's Exhibit E - Expert Report of Brian Herbst), ¶ 10.5, at 36-38.

earlier deposition." *Cooper v. Georgia Department of Transportation*, 837 F. App'x 657, 665 (11th Cir. 2020).

Plaintiff responds that Lewis does not offer any "new" opinions in his affidavit. Instead, he simply expanded upon *facts* that support his existing opinion: *i.e.*, the roof deformation caused Mr. White to be partially ejected from the vehicle, which caused his death.[51] Plaintiff also argues that the affidavit cannot be considered a "sham" because Lewis's additional comment on the glass breaking as a factor contributing to Mr. White's partial ejection does not contradict any of his previous opinions.[52]

The court agrees that Mr. Lewis's opinion is neither new nor contradictory to his expert report or deposition. Accordingly, defendant's motion to strike paragraphs 41 through 44 of his affidavit is due to be denied.

## E. Motion to Strike the Affidavit of Tammy Walker (doc. no. 75)

Ford moves to strike Tammy Walker's affidavit[53] because it was not timely disclosed. Ms. Walker was the passenger in Mr. White's Taurus during the accident. Federal Rule of Civil Procedure 26 provides that:

(1) In General. A party who has made a disclosure under Rule

---

[51] *See* doc. no. 77 (Plaintiff's Opposition to Motion to Strike Lewis Affidavit), at 2.

[52] *See id.* at 10.

[53] Doc. no. 60 (Plaintiff's Exhibit C - Walker Affidavit), at 14-16.

26(a) — or who has responded to an interrogatory, request for production, or request for admission — must supplement or correct its disclosure or response:  (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing; or (B) as ordered by the court.

Fed. R. Civ. P. 26(e)(1).  In its first set of Interrogatories, defendant requested that plaintiff

Identify *all statements related to the subject accident taken from any witness*, including the name and last known address of each known witness, the date of said statement, and whether the statement was written or oral.

Doc. no. 75-1 (Exhibit A - Ford's First Interrogatories), ¶ 13 (emphasis supplied).

Plaintiff responded to that interrogatory on May 28, 2020, "asserting that its scope encompassed attorney work product."[54]

Ms. Walker signed the subject affidavit on June 22, 2020, and stated that Mr. White was wearing his seatbelt when the accident occurred.[55]  Plaintiff did not disclose the affidavit until it was filed as part of plaintiff's response to defendant's motion for summary judgment on March 5, 2021.  Defendant moves to strike the affidavit pursuant to Federal Rule of Civil Procedure 37, which provides:

If a party fails to provide information or identify a witness as

---

[54] Doc. no. 75 (Motion to Strike Walker Affidavit), ¶ 5.

[55] *See* doc. no. 60 (Plaintiff's Exhibit C - Walker Affidavit), at 16.

required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c)(1).

Plaintiff maintains in response to defendant's motion to strike that Ms. Walker's affidavit was protected by the so-called "attorney work-product doctrine" and, thus, the failure to disclose was substantially justified.[56] The "attorney work-product doctrine" protects "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Fed. R. Civ. P. 26(b)(3)(A). As this judicial officer recently held in another case, however:

> *Draft affidavits* are generally considered to be attorney work product. *See Randleman v. Fidelity National Title Insurance Co.*, 251 F.R.D. 281, 285 (N.D. Ohio 2008).
>
> In contrast, *final*, *signed*, and *notarized third-party affidavits* "are normally not immune from disclosure for the very reason that an affidavit purports to be a statement of facts within the personal knowledge of the witness, and not an expression of opinion of counsel." *Federal Deposit Insurance Corp. v. Arrilaga-Torrens*, 212 F. Supp. 3d 312, 368 (D. P.R. 2016) (citing *Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 422 (D. N.J. 2009) (compelling disclosure of an affidavit in light of the fact that, for the court, the primary purpose of the work product doctrine is "to protect counsel's trial strategies and mental impressions, not [counsel's] choice as to an affiant's testimony of underlying facts") (alteration supplied); *Basaldu v. Goodrich Corp.*, No. 4:06-cv-23, 2009 WL 1160915, at *1 (E.D. Tenn. Apr. 29, 2009) (requiring production of affidavits because "[a]n attorney's memorialization of events, effectively acting as a

---

[56] *See* doc. no. 78 (Plaintiff's Opposition to Motion to Strike Walker Affidavit).

stenographer, does not fall within the sphere of documentation protected by the work product privilege"); *Tuttle v. Tyco Electronics Installation Services Inc.*, No. 2:06-cv-581, 2007 WL 456150, at *1 (S.D. Ohio Dec. 21, 2007) (ordering production of third-party affidavits)).

*Minor v. Central Forest Products, Inc.*, No. 3:29-cv-1631-CLS, doc. no. 69 (N.D. Ala. Mar. 8, 2021). For those reasons, plaintiff's invocation of the work-product doctrine is not persuasive, and Tammy Walker's affidavit will be struck from consideration when addressing Ford's motion for summary judgment.

### III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-

moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alterations supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.").

Ford Motor Company advances two arguments in support of summary judgment. First, it argues that once the inadmissible expert testimony has been excluded, plaintiff lacks substantial evidence that an alleged defect in the subject vehicle's roof caused Mr. White's injuries and that an alternative roof design would have prevented his death. Therefore, defendant argues, plaintiff's Alabama Extended Manufacturers Liability Doctrine and negligence claims fail as a matter of law.[57] This

---

[57] *See* doc. no. 28 (Brief in Support of Motion for Summary Judgment), at 19, 21-23.

court has held, however, that the testimony of plaintiff's experts is admissible. Accordingly, their testimony creates a genuine dispute of material fact that requires this court to deny defendant's motion for summary judgment.

Second, defendant argues that plaintiff lacks substantial evidence to support her wantonness claim. To prove wantonness, plaintiff must show that Ford, "with reckless indifference to the consequences, . . . consciously and intentionally did some wrongful act or omitted some known duty with knowledge of the existing conditions, and that this act or omission produced the injury complained of." *Joseph v. Staggs*, 519 So. 2d 952, 954 (Ala. 1988). "[I]t is not essential that the actor should have entertained a specific design or intent to injure the plaintiff, only that the actor is 'conscious' that injury will likely or probably result from his actions." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citing *Joseph*, 519 So. 2d at 954). Plaintiff has presented evidence through her expert Brian Herbst that Ford knew that roof crush was dangerous, and that the company provided extra protection for its test drivers with "roll bars" or cages during rollover tests, but did not increase the roof strength of its market vehicles.[58] Proving that Ford knew injury was "likely" or "probable" will be difficult, but viewing the evidence in the light most favorable to the non-moving party, the motion for summary judgment on the wantonness claim is also due

---

[58] *See* doc. no. 64 (Plaintiff's Exhibit H - Brian Herbst Affidavit), at 91-106.

to be denied.

## IV.  CONCLUSION

In accordance with the foregoing discussion, defendant's motions to exclude the opinions of Brian Herbst (doc. no. 31) and Paul Lewis, Jr. (doc. no. 33), motion to strike in part the affidavit of Paul Lewis, Jr. (doc. no. 74), and motion for summary judgment (doc. no. 27) are due to be denied.  Defendant's motion to exclude the opinions of Steven Meyer (doc. no. 29) will be denied as moot.  Finally, defendant's motion to strike the affidavit of Tammy Walker (doc. no. 75) will be granted.  An order consistent with this memorandum opinion will be entered simultaneously herewith.

**DONE** and **ORDERED** this 7th day of July, 2021.

_____
Senior United States District Judge